IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MOHAWK RE-BAR SERVICES, INC., | ) | CASE NO. 1:14 CV 137 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE WELLS |
| | ) | |
| INTERNATIONAL ASSOCIATION OF | ) | |
| BRIDGE, STRUCTURAL, | ) | **MEMORANDUM OF** |
| ORNAMENTAL, AND REINFORCING | ) | **DEFENDANT LOCAL 17** |
| IRON WORKERS LOCAL NO. 17, *et al.*, | ) | **IN SUPPORT OF ITS MOTION TO** |
| | ) | **DISMISS** |
| Defendants. | ) | |

Defendant International Association of Bridge, Structural, Ornamental, and Reinforcing

Iron Workers Local Union No. 17 ("Local 17") submits this Memorandum in Support of its

Motion to Dismiss the Complaint with Prejudice.

I.      STATEMENT OF FACTS.

     A.      Background.

Plaintiff Mohawk Re-Bar Services, Inc. ("Plaintiff" or "Mohawk") alleges Local 17

breached the collective bargaining agreement ("Local 17 CBA"), attached as Exhibit B to

Complaint, Docket No. 1) between Local 17 and Mohawk by violating the "Favored Nations

Clause" contained therein.  Compl. ¶¶1, 15-39.   Plaintiff is a party to the Local 17 CBA pursuant

to a participation agreement.[1]  Compl. ¶9.  The Local 17 CBA requires participating employers to

pay ten dollars ($10.00) into the Iron Workers Local 17 Pension Fund, a multiemployer defined

benefit plan (the "Pension Fund"), for each hour paid.  Compl. Ex. B, Art. X, Art. XVII. If a

participating employer such as Plaintiff ceases to have an obligation to contribute to the Pension

---

[1] While Plaintiff cites a participation agreement dated June 23, 1981, attached as Exhibit 1 is a more current
participation agreement signed by Plaintiff and dated May 2, 1988.  This substitution does not alter Local 17's legal
analysis.

Fund, the employer would generally be required by the Employee Retirement Income Security Act ("ERISA") to pay its portion of the Pension Fund's underfunding, known as withdrawal liability. 29 U.S.C. § 1301, *et. seq.*; *see* Compl. ¶¶9-12.[2]

The Favored Nations Clause, Article XXXV of the Local 17 CBA states:

> If the Union shall furnish Iron Workers to any Employer within the area of jurisdiction of this Agreement upon any more favorable wage rates and conditions than those contained therein, the Union agrees that such more favorable wage rates and conditions other than those contained in a market retention agreement shall automatically be extended to the Employer[.] Special local, area or national agreements negotiated to cover specific projects or classes of work shall be excluded from operation of this provision.

Compl. ¶13 and Ex. B at 35.  Thus, if Local 17 provides Iron Workers to an employer in its jurisdiction on more favorable wage rates and conditions than contained in the Local 17 CBA, the *same* terms must be extended to employers signatory to the Local 17 CBA, unless the more favorable terms stem from a "[s]pecial local area or national agreement[] negotiated to cover specific projects or classes of work."

Article XXVII of the Local 17 CBA, entitled "Settlement of Disputes," contains a robust grievance/arbitration procedure, and provides that "all disputes arising under the Agreement shall be resolved" by the Joint Grievance Committee, which consists of three representatives of the Employer and three representatives of the Union.  Compl. Ex. B at 29-30.  Matters before the Joint Grievance Committee must be decided by a majority vote and such decision is final and binding

---

[2] Local 17 does not confirm or deny the estimated amount of Mohawk's potential withdrawal liability, but does acknowledge that if Mohawk ceased contributing to the Pension Fund, it would be required to pay withdrawal liability, unless Mohawk ceased performing Iron Worker work within Local 17's jurisdiction, pursuant to the construction exception to withdrawal liability.  *See* ERISA § 4203(b)(2), 29 U.S.C. § 1383(b)(2) (construction industry employer that ceases to have an obligation to contribute to a plan is not deemed to have withdrawn unless it continues to perform work within the jurisdiction of the collective bargaining agreement or resumes such work within 5 years and does not resume contributions to the plan).

upon all parties.  *Id.*  "The Joint Grievance Committee shall have the right to assess financial and/or other specific remedies for those who violate the Collective Bargaining Agreement."  *Id.*  If the Joint Grievance Committee deadlocks, the dispute is submitted to a Board of Umpires consisting of one representative selected by the Employer, one selected by the Union, and a third selected by the other two.  The results of such arbitrations are binding upon the Parties.  *Id.*

Plaintiff is also party to an agreement ("International Agreement") with the International Association of Bridge, Structural, Ornamental, and Reinforcing Iron Workers (the "International").  Compl. ¶38, Ex. D.  Section 11 of the International Agreement refers "any dispute as to the application or interpretation" of that agreement to the grievance procedure contained in the relevant local union agreement.  Compl. Ex. D at §11.  Thus, the grievance procedure for disputes pertaining to the International Agreement and relating to work within Local 17's jurisdiction is Article XXVII of the Local 17 CBA, described immediately above.

### B.    The Harris Davis Rebar Agreement.

In March of 2013, the International entered into a National Reinforcing Steel Agreement with Defendant Harris Davis, attached as Exhibit 2 ("Rebar Agreement").[3]  Compl. ¶16. Generally, the Rebar Agreement requires Harris Davis to conform to the terms and conditions of employment in force in the jurisdiction in which Harris Davis is performing covered work, with a modification which permits Harris Davis to make contributions to a defined contribution plan in lieu of any defined benefit plan specified in the local union's collective bargaining agreement.  Ex. 2 at §6(A); Compl. ¶17.  This arrangement precludes the possibility that Harris Davis may in the future become responsible for withdrawal liability.  *See* Compl. ¶18.

Plaintiff claims: (i) the International's Constitution ("Constitution") obligates Local 17 to

---

[3] Plaintiff attached to its Complaint as Exhibit C an apparent draft copy of the Harris Davis Rebar Agreement.  *See* Compl. ¶¶16-17.  Local 17 has attached a copy of the executed agreement between the International and Harris Davis. *See* Ex. 2.  This substitution does not alter Local 17's legal analysis.

provide Iron Workers to Harris Davis under the terms of the Rebar Agreement; and (ii) accordingly, Local 17 provided Iron Workers to Harris Davis sometime after April 4, 2013 consistent with the terms of the Rebar Agreement and the Local 17 CBA.  Compl. ¶¶23-29. Plaintiff also alleges that Local 17 would risk the International taking action against Local 17 if it did not comply with the Rebar Agreement.  Compl. ¶¶19-23.[4]

Plaintiff then complains that this activity violates the Favored Nations Clause of the Local 17 CBA because, if the same defined contribution plan terms were extended to Plaintiff, Plaintiff would incur withdrawal liability under ERISA.  Compl. ¶¶30, 32.  Finally, based upon Local 17's foregoing conduct, Plaintiff alleges antitrust violations.  Compl. ¶¶86-94; 103-09.

## II.    STATEMENT OF THE ISSUES.

The Court lacks subject matter jurisdiction over Count I (Violation of Local 17 CBA) because Plaintiff has failed to exhaust the dispute resolution procedure provided in the Local 17 CBA.  Alternatively, Count I fails to state a claim for which relief can be granted because: (i) Plaintiff failed to exhaust its contractual remedies; (ii) Plaintiff fails to allege that the Rebar Agreement is not a Special National Agreement excluded from the application of the Favored Nations Clause, and thus fails to allege a violation of the Favored Nations Clause; and (iii) by Plaintiff's own admission, even if the Favored Nations Clause applied, there are no favorable terms and conditions for Local 17 to extend to Mohawk under that Clause.

The Court should dismiss Count IV (Conspiracy to Monopolize) against Local 17 because Mohawk has failed to allege the elements of the claim.  Further, because Local 17 acted in its own self-interest and has not combined with a non-labor organization with predatory intent, it is protected by the statutory labor exemption to federal antitrust law.  Alternatively, Local 17 is

---

[4] Local 17 does not admit that this action violates the Favored Nations Clause of the Local 17 CBA for the reasons explained in this Memorandum.

4

protected by the nonstatutory labor exemption because the Rebar Agreement's primary effect is on the parties thereto: it concerns retirement benefits a mandatory subject of bargaining) and Mohawk has not alleged that it was the result of anything other than arm's length bargaining.  Count VI (Valentine Act) should be dismissed because it is preempted by federal labor law.

## III.    ARGUMENT.

### A.    The Standard Of Review.

When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction to survive the motion, and the court is empowered to resolve factual disputes when necessary to resolve challenges to subject matter jurisdiction.  *Madison-Hughes v. Shalala*, 80 F.3d 1121, 1130 (6th Cir. 1996).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must state a claim for relief "that is plausible on its face."  *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (1997)).  It must contain factual allegations that "raise a right to relief above the speculative level" and must do more than simply create a "suspicion" of a legally cognizable right of action. *Twombly*, 127 S. Ct. at 1965; *accord Bishop*, 520 F.3d at 519.  Conclusory allegations will not suffice.  *Id.*

### B.    Count I Should Be Dismissed.

#### 1.    Plaintiff Has Failed to Exhaust The Contractual Grievance Procedures Under The Local 17 CBA.

Section 301(a) of the Labor Management Relations Act ("LMRA") grants federal courts subject matter jurisdiction over suits for violation of contracts between an employer and a labor organization.  29 U.S.C. § 185(a).  However, one of the prerequisites to suit under Section 301 is that the parties exhaust grievance and arbitration procedures established by the applicable collective bargaining agreement.  *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1216 (6th Cir.

1987), citing *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652-53 (1965), *see also Kentucky State Dist. Council of Carpenters v. Wehr Constructors*, 1993 U.S. App. LEXIS 20288, 10 (6th Cir. July 28, 1993) ("[A]n attempt to exhaust contractual grievance and arbitration procedures, generally speaking, is a prerequisite to any Section 301 action where the collective bargaining agreement sued upon provides for such procedures").  Whether a dispute must be arbitrated before judicial relief may be sought is determined by analyzing the collective bargaining agreement to see if it permits or requires arbitration.  *Apponi*, 809 F.2d at 1216.

When collective bargaining agreements contain procedures for settling disputes through mutual discussion and arbitration, these provisions are to be enforced under Section 301.  *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562 (1976).  Final adjustment by a method agreed upon by the parties is the desirable method for settlement of grievance disputes.  *Id.*  "Courts are not to usurp those functions which collective-bargaining contracts have properly 'entrusted to the arbitration tribunal.'"  *Id.*, quoting *Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 569 (1960). Permitting parties to sidestep available grievance procedures "would cause arbitration to lose most of its effectiveness" and eviscerate a central tenet of federal labor law that the arbitrator, not the court, has the responsibility to interpret the contract in the first instance.  *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985).

 The failure to exhaust contractual remedies is regarded as jurisdictional in this circuit. *Yenyo v. Fairmount Foods Co.,* 661 F.2d 935, 935 (6th Cir. 1981); *see also Durham v. Mason & Dixon Lines, Inc.*, 404 F.2d 864, 865 (6th Cir. 1968) (the "failure to exhaust the grievance procedure deprived the District Court of jurisdiction and therefore precluded a decision on the merits").  However, the proper treatment of a motion to dismiss for failure to exhaust contractual remedies has been a subject of "some confusion" in federal courts.  *Youseff v. Ford Motor Co.*, 2000 U.S. App. LEXIS 14080, fn3 (6th Cir. June 6, 2000) (noting the Sixth Circuit "has

apparently treated motions to dismiss for failure to exhaust remedies in § 301 cases as Rule

12(b)(6) motions); *Local Union 369, IBEW v. ADT Sec. Servs.*, 393 Fed. Appx. 290, 293 (6th Cir.

2010) (noting the failure to exhaust contractual arbitration procedures generally results in

dismissal under Rule 12(b)(6)).  Therefore, if the Court determines that dismissal of Count I is not

appropriate under Rule 12(b)(1), Local 17 seeks in the alternative that the Court dismiss Count I

for failure to exhaust the contractual remedies under Rule 12(b)(6).

> **a.     Plaintiff Has Not Exhausted The Dispute Resolution Procedures
> Provided In The Local 17 Collective Bargaining Agreement.**

Plaintiff alleges that Local 17 has violated the Favored Nations Clause of the Local 17

CBA by "relieving Harris Davis of the obligation to contribute to the Pension Fund" which allows

Harris Davis to avoid the withdrawal liability that Plaintiff would be subject to if it ceased to

contribute to the Pension Fund. Compl. ¶¶34-35.  Plaintiff acknowledges that the Local 17 CBA

contains a grievance procedure.  Compl. ¶36.  However, Plaintiff mischaracterizes the grievance

and arbitration procedure of the Local 17 CBA as covering only "disputes or disagreement arising

**between parties** to the Contract." Compl. ¶37 (emphasis supplied).  In fact, Article XXVII of the

Local 17 CBA provides a dispute resolution procedure culminating in binding arbitration for "**all**

**disputes** arising **under the Agreement**."  Compl. Ex. B at 29-30 (emphasis supplied).

Plaintiff alleges a violation of the Favored Nations Clause contained in the Local 17 CBA,

which is a dispute "arising under the Agreement."  Mohawk has not alleged that it has exhausted

or even attempted to resolve its disagreement through grievance procedure.  Thus, Plaintiff's claim

should be dismissed for lack of subject matter jurisdiction, or, in the alternative, for failure to state

a claim upon which relief can be granted.

  **b.** **Plaintiff Is Not Excused From Attempting To Exhaust The Contractual Dispute Resolution Procedures.**

  A plaintiff proceeding under LMRA Section 301 may only be excused from attempting to exhaust the contractual arbitration remedy when the conduct of the other party amounts to a repudiation of the contractual procedures, or, where an effort to proceed formally with contractual or administrative remedies would be wholly futile.  *Kentucky State Dist. Council of Carpenters,* 1993 U.S. App. LEXIS 20288 at 11-12, quoting *Vaca v. Sipes*, 386 U.S. 171, 185 (1967) and *Glover v. St. Louis-San Francisco Ry.*, 393 U.S. 324, 330 (1969).

  The Sixth Circuit has held that a bare allegation of futility in a complaint is not sufficient to excuse failure to utilize the grievance-arbitration procedure of a collective bargaining agreement.  *Yenyo*, 661 F.2d at 935, citing *Willetts v. Ford Motor Company*, 583 F.2d 852, 856 (6th Cir. 1978).  Generally, it cannot be said that contractual grievance procedures are inadequate to protect the interests of an aggrieved party until the party has attempted to implement the procedures and found them to be inadequate.  *Id.*, quoting *Maddox*, 379 U.S. at 653.

  Plaintiff's conclusory allegation that arbitration would provide no effective remedy is speculative and baseless.  *See* Compl. ¶38.  Arbitrators have the authority to remedy breach of a favored nations clause, in the event one is found, by awarding damages.  *See, e.g., Prate Installations, Inc. v. Chicago Regional Council of Carpenters*, 607 F.3d 467 (7th Cir. 2010) (affirming confirmation of arbitration awarding damages for violation of favored nations clause). Plaintiff agreed to this remedy when it signed the participation agreement agreeing to all terms of the Local 17 CBA.  It now seeks to unilaterally repudiate its agreement by requesting the Court's assistance.  The Court should decline Plaintiff's request because it has no legal basis to make it.

      **2.**      **In The Alternative, Count I Fails To State A Claim Because The Rebar Agreement Is Specifically Exempted From The Favored Nations Clause.**

The Favored Nations Clause, Article XXXV of the Local 17 CBA, contains an explicit exclusion: "Special local, area or national agreements negotiated to cover specific projects or classes of work shall be excluded from operation of this provision."  Compl. Ex. B at 35.

The Rebar Agreement between Harris Davis and the International describes the special class of work it covers:

> This Agreement covers (a) all operations performed by the Employer or a Subsidiary of the Employer at the site where reinforcing steel, cables and other materials used to reinforce concrete construction are to be placed or assembled to the extent such operations involve the assembly, pre-assembly, modification, field fabrication, handling, racking, sorting, cutting bending, burning, hoisting, placing, welding and tying of all materials used to reinforce concrete construction that the Employer or a Subsidiary of the Employer is contractually obligated to perform and (b) other such work as may be mutually agreed to in writing by the President of the Employer and the International Association… .

Ex. 2 at §2; Compl., Ex. C at §2.

The Rebar Agreement covers only a small subset of the craft jurisdiction of the Local 17 collective bargaining agreement.  *See* Compl., Ex. B, Article I(b)-(o).  Thus, the Rebar Agreement covers only a specific class of work typically performed by Iron Workers (rebar work).  In addition, the Rebar Agreement is national in scope.  While the Local 17 CBA is geographically limited to Northeast Ohio,[5] there is no geographical limit in the Rebar Agreement.  *See generally* Ex. 2.  Therefore, the Rebar Agreement is a special national agreement covering a specific class of work and is expressly excluded from the application of the Favored Nations Clause.  As a result, Count I fails to state a claim and should be dismissed.

---

[5] *See* Article II of the Local 17 CBA, Compl. Ex. B.

3.  **In The Alternative, Count I Fails To State A Claim Because Withdrawal Liability Is Not A Wage Rate Or Condition Of Employment.**

The Favored Nations Clause requires Local 17 to extend to participating employers any "more favorable wage rates and conditions" that are offered to other employers in Local 17's jurisdiction.  Compl. ¶13 and Ex. B at 35.  Assuming *arguendo* that the Rebar Agreement is not a special national agreement excluded from the Favored Nations Clause, Plaintiff has admitted in its Complaint that there are no favorable terms for Local 17 to extend to Mohawk under the Favored Nations Clause: "Even if Local 17 attempted to comply with the Favored Nations Clause by relieving Mohawk … from making contributions to the Pension Fund, such purported 'favorable' term would trigger withdrawal liability."  Compl. ¶32. The extension of the defined contribution plan modification in the Rebar Agreement to Plaintiff would trigger withdrawal liability, but such withdrawal liability is not a term or condition of employment that is governed by the collective bargaining agreement.  Rather, the withdrawal liability is imposed by ERISA, 29 U.S.C. § 1381, and is outside the scope of the Local 17 CBA.  The Favored Nations Clause requires Local 17 to extend more favorable wage rates and conditions of employment to Plaintiff; it does not require Local 17 to relieve Plaintiff of statutory obligations imposed by ERISA.  Plaintiff implicitly acknowledges this distinction by stating that extending the allegedly more favorable term to Mohawk would not benefit Plaintiff.  Therefore, Count I should be dismissed.

C.  **Count IV Should Be Dismissed Because Mohawk Fails To State A Plausible Federal Antitrust Claim Against Local 17.**

1.  **Mohawk Fails To Allege An Agreement, Overt Act, Or Specific Intent By Local 17.**

To state a conspiracy to monopolize claim under Section 2 of the Sherman Antitrust Act, (the "Act"), 15 U.S.C. § 2, a plaintiff must allege: "(1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal

connection between the conspiracy and the injury alleged." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010) (citing *United States v. Yellow Cab Co.*, 332 U.S. 218, 224-25 (1947)).

As to the first element, Mohawk has failed to allege facts tending to show that Local 17 agreed with Harris Davis and the International to monopolize the relevant market. Mohawk has instead asserted a bare formulation of the element, claiming that: "Harris Davis engaged in concerted activity or conspired with . . . Local 17" (Compl. ¶88; *accord.* ¶¶91-93); and "Local 17 . . . conspired and combined with Harris Davis" (*Id.* ¶90). Such formulaic allegations are insufficient to allege a plausible claim. *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1974 (1997). Moreover, Local 17 is not even a party to the Rebar Agreement. *See* Compl. ¶¶16, 88; Ex. 2. Mohawk has not alleged other facts to show that Local 17 has an agreement with Harris Davis, to monopolize or otherwise. Rather, Mohawk has alleged that Local 17 acted pursuant to the Constitution rather than any agreement with Harris Davis. (Compl. ¶23.)

Further, Mohawk's conspiracy claim cannot survive based on any agreement between Local 17 and the International. An agreement in violation of Section 2 of the Act must be between two or more independent economic actors. *Potters Medical Center v. The City Creek Bio – Medical, Inc.*, 800 F.2d 568, 573 (6th Cir. 1986). The allegations in the Complaint demonstrate that Local 17 cannot act independently from the International for the purposes of the Rebar Agreement. Mohawk has alleged that under the Constitution, the International can compel Local 17's compliance with the Rebar Agreement. Compl. ¶¶19-22. Accordingly, Local 17 and the International cannot conspire together within the meaning of the Act.

As to the second element of the claim, Mohawk alleges Local 17's "overt act" was to "provide[] Iron Workers to Harris Davis to perform the Covered Work… ." (Compl. ¶28.) It also alleges that, consistent with the Rebar Agreement, Local 17 provided the workers "without

requiring Harris Davis to pay into the Pension Fund." (Compl. ¶29.) If proven, those facts would not constitute an overt act in furtherance of a conspiracy to monopolize because providing workers to signatory contractors (either through a Local or International agreement) is within Local 17's normal business conduct. *C.f.*, *In re "APOLLO" Air Passenger Computer Reservations Sys.*, 720 F. Supp. 1068, (S.D.N.Y. 1989) (actions that do not "go beyond normal honesty or industrial business conduct" are not "overt acts" under antitrust laws). As noted above, Local 17 provides Iron Workers both to Harris Davis and to Mohawk, in both instances because each employer has a contract with the International.

As to the third element, Mohawk alleges no facts to support a conclusion that Local 17 acted with specific intent to monopolize. *See Richter Concrete Corp. v. Hilltop Basic Resources, Inc.*, 547 F. Supp. 893, 914 (S.D. Ohio 1981). Specific intent is a necessary element of the claim. *Id.* Moreover, the intent must be to accomplish an unlawful purpose. *Lewis v. Pennington*, 400 F.2d 806, (6th Cir. 1968). Mohawk asserts that Local 17 acted "with intent to lessen or eliminate competition by and between Harris Davis and Mohawk or other competitors in the relevant market" but alleges no facts to support that statement. (Compl. ¶91.) On the contrary, Mohawk assigns two motives to Local 17: (1) avoiding charges by the International for failure to abide by the Constitution; and (2) acquiring Carpenter hours. (Compl. ¶¶19-23.) Neither purpose is unlawful. Rather, a union's intent to acquire more work for its members is protected by federal labor law. *Phoenix Elec. Co. v. Nat'l Electrical Contractors Ass'n*, 867 F. Supp. 925, 942 (D. Or. 1994) (A union's "organization of the entire work force in any particular area by legitimate means would offend no law… .").

As to the final element, because, as shown above, there is no conspiracy here, there can be no causal connection between the conspiracy and the alleged injury.

### 2.  Local 17 Is Protected By The Statutory Labor Exemption Or, Alternatively, By The Nonstatutory Exemption.

To succeed against a labor organization, an antitrust plaintiff must also overcome the statutory and nonstatutory labor exemptions to federal antitrust law.  *See James R. Snyder Co., Inc. v. Associated Gen. Contractors of Am.*, 677 F.2d 1111, 1118 n.10 (6th Cir. (1982).

Congress created a statutory exemption from federal antitrust law for unilateral actions undertaken by a labor organization in its own self-interest.  *H.A. Artists & Assocs., Inc. v. Actor's Equity Ass'n*, 451 U.S. 704, 714 (1981).  Here, Plaintiff claims Local 17 acted in its own self-interest to avoid charges from the International and to acquire hours for its members.  Compl. ¶¶19-22, 90. The statutory exemption is lost only if the labor organization combines or conspires with a non-labor organization.  *H.A. Artists, 451 U.S.* at 715.[6]  As shown above, Mohawk has not alleged facts showing that Local 17 combined or conspired with any entity other than the International, a labor organization.

A labor organization's action in furtherance of a greater share of work within a jurisdiction exemplifies conduct the statutory exemption protects.  *Phoenix Elec. Co.*, 867 F. Supp. at 936.  In *Phoenix*, the court addressed a job targeting program under which a union agreed to supply workers to unionized contractors for targeted projects at concessionary wages.  *Id.*  The union in turn supplemented those workers' wages through a fund to which members working non-targeted jobs contributed 3.5% of their wages.  *Id.*  The union adopted the program to increase unionized contractors' competitiveness in response to a loss of work to non-union workers.  *Id.*  The court found the union's motive of increasing members' work was in its self-interest despite the overall decrease in wages.  Accordingly, it held the program fell under the statutory exemption.  *Id.*

Similarly, the International and Local 17's alleged motive of acquiring "hours previously

---

[6] In analyzing monopoly claims, "'combine' and 'conspire' are used interchangeably . . . [to] refer to a single offense. *Richter*, 547 F. Supp. at 914.

performed by Carpenters" is self-interested.  Their actions furthering that motive, including providing Iron Workers to Harris Davis, are thus protected.

Should the Court find the statutory exemption does not apply, Local 17 is still protected by the nonstatutory labor exemption.  The exemption covers a labor-nonlabor combination if the agreement or restraint at issue: (1) primarily affects only the parties thereto; (2) concerns a mandatory subject of bargaining; and (3) results from bona fide arm's length bargaining.  *McCourt v. California Sports, Inc.*, 600 F.2d 1193, 1197-98 (6th Cir. 1978).  To overcome the exemption, a plaintiff must show the union entered into the agreement with "the intent to injure the plaintiff['s] business, *i.e.*, with predatory intent."  *James R. Snyder Co.*, 677 F.2d at 1119.

An agreement primarily affects only the parties thereto if the primary impact is on the agreeing employer and its employees.  *Zimmerman v. Nat'l Football League*, 632 F. Supp. 398, 405 (D.D.C. 1986).  In *Zimmerman*, the court examined the first element of the nonstatutory exemption and found that its purpose is to withhold the nonstatutory exemption from agreements that primarily impact the employer's competitors or persons entirely unconnected with the bargaining relationship.  *Id.*  Here, the restraint at issue—Harris Davis's nonpayment into the Pension Fund for hours worked by its covered employees—affects primarily only Harris Davis and Local 17 and its members who work for Harris Davis.  Thus, the Rebar Agreement's primary impact is not on Harris Davis's competitors, even if it has a secondary impact on them.

Any agreement here also meets the second element, because retirement benefits are a mandatory subject of bargaining.  *See Wash. Sprinkler, Inc.*, 344 N.L.R.B. 396, 397 (N.L.R.B. 2005) (noting that construction industry pension funds are mandatory subjects of bargaining).  The last element is satisfied because Mohawk has utterly failed to allege facts showing that the Rebar Agreement was not the product of arm's length collective bargaining.  (*See* Compl. ¶16, 89.)

14

**D.    Count VI (Valentine Act) Should Be Dismissed Because It Is Preempted By Federal Labor Law.**

The U.S. Supreme Court has long held that federal labor law preempts Ohio's Valentine Act when it is applied to a labor organization's agreement regarding a mandatory subject of bargaining.  *Local 24, Int'l Bhd. of Teamsters v. Oliver*, 358 U.S. 283, 295 (1959).  Similarly, in *Connell Const. Co., Inc. v. Plumbers & Steamfitters Local Union No.* 100, 421 U.S. 616, 637 (1975), the court held that a state antitrust claim may not be maintained when it creates "a substantial risk of conflict with policies central to federal labor law." More generally, a state's antitrust act does not apply when the claim relates to activity either arguably protected or prohibited by Sections 7 or 8 of the National Labor Relations Act, 29 U.S.C. §§ 157-158.  *See Weber v. Anheuser-Bush Inc.,* 348 U.S.468, 481 (1955).

As shown above, the claim here is preempted by labor exemptions to federal antitrust law. A Valentine Act claim risks substantial conflict with the policies underlying those exemptions. Further, collective bargaining is protected by Section 7 of the NLRA.  Because the restraint at issue here is a collectively-bargained provision related to the mandatory bargaining subject of retirement benefits, the Valentine Act is preempted.

> Respectfully submitted,
>
> SCHWARZWALD McNAIR & FUSCO LLP
>
>  /s/ Eben O. McNair, IV
> Eben O. McNair, IV (0026049)
> Catherine R. Donnelly (0084039)
> Jessica S. Monroe (0089413)
> 616 Penton Media Building
> 1300 East Ninth Street
> Cleveland, Ohio 44114-1503
> (216) 566-1600
> emcnair@smcnlaw.com (E-mail)
>
> Counsel for Defendant Local 17

15