UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MOHAWK RE-BAR SERVICES, Inc., | ) |
| Plaintiff, | ) |
| v. | ) Case No.: 1:14cv137 |
| | ) Judge Wells |
| INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL, and REINFORCING IRON WORKERS LOCAL UNION NO. 17, et al., | ) |
| Defendants. | ) |

**INTERNATIONAL ASSOCIATION OF BRIDGE,
STRUCTURAL, ORNAMENTAL AND REINFORCING
IRONWORKERS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

### I. Introduction

Plaintiff filed suit for breach of a labor agreement and antitrust violations against defendants International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, Local Union No. 17 ("Local 17"), International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, AFL-CIO (the "International"), Nucor Corporation ("Nucor"),[1] and Harris Davis Rebar, LLC ("Harris Davis").

Count I claims that the International breached a "Favored Nations" clause in the collective bargaining agreement between plaintiff and Local 17 by entering into a National Reinforcing Steel Agreement ("Rebar Agreement") with Harris Davis. This allegation utterly lacks merit because the Favored Nations provision contains an explicit exception for "Special

---

[1] Despite naming it as a defendant, plaintiff has failed to allege any counts against Nucor directly.

Local Area or National Agreements negotiated to cover project or classes of work"—i.e., the Rebar Agreement.

The apparent basis of the antitrust claims in Count IV and VI is that the International gave an unfair advantage to Harris Davis through the Rebar Agreement because it allows Harris Davis to operate in Local 17's jurisdiction without requiring it to contribute to the Iron Workers Local 17 Pension Fund ("Local 17 Pension Fund"). To the contrary, no competitive advantage is given to Harris Davis because the Rebar Agreement requires it to contribute an amount equal to the local defined benefit plan's contribution rate. Moreover, plaintiff failed to plead that the International acted with the requisite intent to cause an antitrust violation. Finally, even assuming arguendo plaintiff adequately pled intent, the International's conduct is protected by the nonstatutory labor exemption.

## II.  Argument

### A.  Standards Governing 12(b)(6) Motions

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." While the non-movant's factual allegations must be taken as true, a court is not required to accept mere legal allegations as true. Blakely v. United States, 276 F.3d 853, 863 (6th Cir. 2002).

In order to survive dismissal for failure to state a claim, the plaintiff must "[nudge] their claims across the line from conceivable to plausible." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly). Rule 8(a)(2) "requires more than labels and conclusions, and a formulaic recitation of the elements of the cause of

action will not do…" Twombly, 550 U.S. at 555. Plaintiff cannot meet these standards with respect to its claims against the International and the Complaint should be dismissed with prejudice.

### B. Count I Must be Dismiss Because the Rebar Agreement is Specifically Exempted from the Favored Nations Clause

As alleged by plaintiff, the Favored Nations clause, Article XXXV of the collective bargaining agreement between Local 17 and plaintiff, reads:

> If the Union shall furnish Iron Workers to any Employer within the area of jurisdiction of this Agreement upon any more favorable wage rates and conditions than those contained therein, the Union agrees that such more favorable wage rates and conditions other than those contained in a market retention agreement shall automatically be extended to the Employer[.] <u>Special local, area or national agreements negotiated to cover specific projects or classes of work shall be excluded from operation of this provision</u>.

Document 1-2 at 35 (emphasis added). Therefore, there is a proviso built into the Local 17 collective bargaining agreement for "special local, area or national agreements negotiated to cover specific projects or classes of work."

The Rebar Agreement is a national agreement covering specific classes of work and thus is excluded from the Favored Nations clause in the Local 17 collective bargaining agreement. Section 2 of the Rebar Agreement describes the work covered by the Agreement:

> This Agreement covers (a) all operations performed by the Employer or a Subsidiary of the Employer at the site where reinforcing steel, cables and other materials used to reinforce concrete construction are to be placed or assembled to the extent such operations involve the assembly, pre-assembly, modification, field fabrication, handling, racking, sorting, cutting bending, burning, hoisting, placing, welding and tying of all materials used to reinforce concrete construction that the Employer or a Subsidiary of the Employer is contractually obligated to perform and (b) other such work as may be mutually agreed to in writing by the President of the Employer and the International Association…

Document 1-3 at Section 2. Indeed, the Rebar Agreement covers only a small subset of the craft jurisdiction of the Local 17 collective bargaining agreement. See Document 1-2, Article I(a)-(o).

3

Thus, the Rebar Agreement covers only a specific class of work typically performed by Iron Workers—rebar work.

Moreover, the Rebar Agreement is national in scope. Unlike the Local 17 collective bargaining agreement,[2] there is no geographical limit on the Rebar Agreement. See generally Document 1-3. Therefore the Rebar Agreement is a national agreement covering specific classes of work—and as such is excluded from the application of the Favored Nations clause.

Finally, by its own terms, the Rebar Agreement overrides the Local 17 collective bargaining agreement. Indeed, Section 6(F) reads in relevant part: "[T]his Agreement shall override any conflicting Local Union or District Council Agreement, except for projects governed by a Project Labor Agreement, National Maintenance Agreement or any other multi-international agreement which dictates that it overrides this Agreement." Document 1-3 at Section 6(F).

Count I must be dismissed because plaintiff can show no violation of the Favored Nations clause based on the plain reading of the relevant agreements.

Even if Count I states a claim against Local 17, plaintiff fails to plead that the International is responsible for Local 17's alleged failure to permit Mohawk to contribute to a defined contribution plan. Indeed, an international union is not responsible for a local's actions unless an agency relationship exists. See, e.g., Carbon Fuel Co. v. United Mine Workers of America, 444 U.S. 212, (1979); Wilkes-Barre Pub. Co. v. Newspaper Guild of Wilkes-Barre, Local 120, 647 F.2d 372, 382 (3rd Cir. 1981) (holding that international was not responsible for violation of local's collective bargaining agreement where it was not a party to that agreement).

---

[2] The Local 17 collective bargaining agreement is geographically limited to the counties listed in Article II. Document 1-2.

4

### C. The Antitrust Claims Must be Dismissed

In Counts IV and VI of the Complaint, plaintiff has alleged federal and state antitrust violations against the International. Both Counts must be dismissed because the Rebar Agreement gives Harris Davis no advantage over plaintiff in bidding work, plaintiff has failed to plead that the International acted with the intent necessary to cause an antitrust violation, and the International's conduct is protected by the nonstatutory labor law exemption.

#### 1. The Rebar Agreement Gives No Competitive Advantage to Harris Davis

The structural underpinning of Counts IV and VI of the Complaint is that the Rebar Agreement gives Harris Davis an unfair advantage over plaintiff's ability to bid work. For the following reasons, this is untrue. As such, Counts IV and VI must be dismissed with prejudice.

##### a. The Rebar Agreement Requires the Same Total Wage/Fringe Package as the Local 17 Collective Bargaining Agreement

Plaintiff claims that the Rebar Agreement permits Harris Davis to bid jobs at prices "significantly below" those of plaintiff. Complaint ¶61. See also, Complaint ¶26 ("On information and belief, the reason Harris Davis could and did submit a materially lower (and successful) bid was because it did not have to contribute to the [P]ension Fund as provided for in the Rebar Agreement."). This allegation is refuted by the plain terms of the Rebar Agreement. Indeed, the Rebar Agreement requires Harris Davis to pay a wage and fringe package equal to that required by the local union's collective bargaining agreement. See Document 1-3 at Section 6(A). Therefore, when performing work in Local 17's geographical jurisdiction, Harris Davis' gross wage and fringe package is identical to that paid by plaintiff.

While the fringe benefit contribution obligation under the Rebar Agreement does not differ quantitatively from plaintiff's obligation, it does differ qualitatively—albeit in an

insignificant manner. Under the Rebar Agreement, Harris Davis is not required to directly contribute to the local union's defined benefit pension plan. See Document 1-3 at Section 6(A). However, this does not mean that Harris Davis has no financial responsibly for the hourly pension contribution rate. Instead, Harris Davis is required to contribute an amount equal to the local pension contribution rate as follows:

(1) To the local union's defined contribution annuity fund;

(2) Or if there is no local defined contribution annuity fund or if that fund rejects Harris Davis' contributions, to a mutually agreed-upon defined contribution plan.

Pursuant to the Side Letter Agreement incorporated into the Rebar Agreement,[3] Harris Davis and the International designated the Regional District Council Retirement Plan and Trust ("RDC Plan") as the recipient in the event there is no local annuity plan or the local annuity rejects the contributions. See Affidavit of Eric Dean, ¶3, Exhibit 1 (at Side Letter Agreement, Section 1).

### b. Withdrawal Liability is a Contingent Debt Which Has No Impact on Plaintiff's Ability to Bid Work

Another way in which plaintiff claims that Harris Davis is able to undercut its bids is that Harris Davis potentially avoids withdrawal liability through the Rebar Agreement. See Complaint ¶34.[4] This is a nonsensical argument which seriously misstates the nature of withdrawal liability.

---

[3] The Side Letter Agreement was not included in Exhibit C to plaintiff's Complaint.

[4] Complaint ¶34 reads: "By avoiding a contribution obligation to the Pension Fund, Harris Davis avoids the grievous burden of pension withdrawal liability borne by Mohawk and/or every other member of the Association, which provides Harris Davis with an incalculable competitive advantage over any employers, including Mohawk, who have and continue to participate and remit contributions into the Pension Fund in exchange for obtaining Iron Workers from Local 17. Such competitive advantage will persist through the term of the Contract, permitting Harris Davis to undercut Mohawk on the pricing of several significant Northeast Ohio construction projects involving Covered Work, including projects scheduled for the first quarter of 2014."

Withdrawal liability is a debt owed by employers which withdraw from a defined benefit pension fund that has unfunded vested benefits ("UVBs"). 29 U.S.C. § 1381, et seq. UVBs are essentially the fund's liabilities minus its assets. Specifically, they are the difference between the present value of the fund's vested benefits (pension benefits currently being paid plus future benefits that will be paid for vested employees) and the current value of the Fund's assets. 29 U.S.C. §1391.

A complete withdrawal occurs when an employer permanently ceases to have an obligation to contribute to the fund or permanently ceases all covered operations under the fund. 29 U.S.C. § 1383(a). An "obligation to contribute" is an obligation which arises under a collective bargaining agreement or as a result of a duty under applicable labor law. 29 U.S.C. § 1392(a).

In the building and construction industry, employers are granted greater protections. There, a complete withdrawal occurs only if the employer ceases to have an obligation to contribute to the fund but the employer continues to perform work (or, within five years, resumes performing work) in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required. 29 U.S.C. § 1383(b)(2). In other words, a mere cessation of the obligation to contribute, such as when a company is sold or goes out of business, is not sufficient to trigger liability. Rather, the employer must continue to perform the same work on a non-contributory (i.e., typically non-union) basis.

Plaintiff has not withdrawn from the Local 17 Pension Fund and it apparently has no plans to do so. See Complaint ¶30. Therefore, it makes no sense how the mere possibility of withdrawal liability (if it fact plaintiff would choose to withdraw) would make it less able to bid

7

work than Harris Davis—which is obligated to pay the same gross wage and fringe package as plaintiff under the Rebar Agreement.

Because a competitive advantage cannot be shown from the face of the Rebar Agreement, Counts IV and VI against the International must fail.

### 2. Plaintiff Failed to Allege the International Intentionally Engaged in an Antitrust Violation

Plaintiff has failed to allege an antitrust violation against the International in Counts IV and VI of the Complaint.[5] A Section 2 conspiracy claim has four elements: (1) an agreement to monopolize, (2) an overt act in furtherance of the conspiracy, (3) a specific intent to monopolize, and (4) a causal connection between the conspiracy and the injury alleged. See, e.g., United States v. Yellow Cab Co., 332 U.S. 218, 224–25 (1947). Specific intent is an essential element of a conspiracy to monopolize claim. Bonjorno v. Kaiser Aluminum & Chem. Corp., 752 F.2d 802, 807 (3rd Cir. 1984); Richter Concrete Corp. v. Hilltop Concrete Corp., 691 F.2d 818, 827 (6th Cir. 1982) (Where a conspiracy to monopolize is alleged, plaintiff must "prove both an existence of conspiracy and specific intent to monopolize"). Specific intent means "an intent which goes beyond the mere intent to do the act." Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 602 (1985) (discussing specific intent in the attempt to monopolize context) (quoting United States v. Aluminum Co. of Am., 148 F.2d 416, 432 (2nd Cir. 1945)).

---

[5] The Valentine Act was "patterned after the Sherman Antitrust Act, and as a consequence [the Supreme Court of Ohio] has interpreted the statutory language in light of federal judicial construction of the Sherman Act." C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp., 407 N.E.2d 507, 509 (Ohio 1980). See also, Johnson v. Microsoft Corp., 834 N.E.2d 791, 795 (Ohio 2005) ("Ohio has long followed federal law in interpreting the Valentine Act..."); Erie County, Ohio v. Morton Salt, Inc., 702 F.3d 860, 868 (6th Cir. 2012) (applying federal law to Valentine Act conspiracy claim). Therefore, to the extent the Valentine Act is not preempted by federal labor law (see part (4) infra), federal antitrust cases are also applicable to plaintiff's Valentine Act claim (Count VI).

8

The Complaint fails to allege specific intent by the International. Plaintiff alleges that the International conspired with Harris Davis so that it would use Iron Workers, not Carpenters, to perform work covered by the Rebar Agreement. Complaint ¶59. In fact, any collective bargaining agreement signed with an Iron Workers local would require the same, including plaintiff's agreement with Local 17. See Document 1-2 at Article I. While plaintiff alleges that the Rebar Agreement gives Harris Davis an advantage over Local 17 contractors (which is untrue under the plain language of the Agreement, as described above), nothing in the Complaint alleges that the Rebar Agreement gives Harris Davis an advantage over Carpenter contractors. Without this allegation, specific intent to commit an antitrust violation cannot be shown against the International.

Therefore, Courts IV and VI must be dismissed against the International for failing to allege specific intent. See Howard Hess Dental Laboratories Inc. v. Dentsply Intern., Inc., 602 F.3d 237, 258 (3rd Cir. 2010) ("At bottom, the Plaintiffs' allegations of specific intent rest not on facts but on conclusory statements strung together with antitrust jargon. It is an axiom of antitrust law, however, that merely saying so does not make it so for pleading-sufficiency purposes.")

### 3. The Nonstatutory Labor Exemption Applies

Finally, even assuming arguendo (but incorrectly) that plaintiff has properly alleged an antitrust violation, the International's conduct is protected by the nonstatutory labor exemption. The Sherman Act contains both a statutory and a nonstatutory labor exemption.

Under the statutory exemption, labor organizations acting in their self-interest and not in combination with non-labor groups are immune from antitrust liability. See United States v. Hutcheson, 312 U.S. 219, 232 (1941). The statutory exemption includes unilateral union activity

9

related to collective bargaining. See, e.g., Smitty Baker Coal Co., Inc. v. United Mine Workers of America, 620 F.2d 416 at 420 (4th Cir. 1980). A union may not rely on the statutory exemption for anticompetitive results of a collective bargaining agreement with an employer because that contract is considered a combination with a non-labor group. See American Steel Erectors, Inc. v. Local Union No. 7, Intern. Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68 (1st Cir. 2008).

Because the statutory exemption does not fully reconcile the tension between antitrust and labor laws, the Supreme Court has also recognized an implicit or "nonstatutory" labor exemption, which applies "where needed to make the collective bargaining process work." Brown v. Pro Football, 116 S. Ct. 2116, 2119 (1996). The nonstatutory exemption acknowledges the legitimacy of successful union efforts to standardize wages and working conditions, and tolerates the lessening of business competition that flows from such agreements. Connell Const. Co. v. Plumbers and Steamfitters Local Union No. 100, 421 U.S. 616, 622, 624 (1975). Conduct that grows out of or is directly related to the lawful operation of the collective bargaining process, that involves mandatory subjects of bargaining, and that concerns the parties to a collective bargaining relationship is accordingly within the nonstatutory exemption. Brown, 116 S.Ct. at 2127.

Under the nonstatutory exemption, the parties to an agreement restraining trade are exempt from antitrust liability if (1) the restraint primarily affects the parties to the agreement and no one else, (2) the agreement concerns wages, hours or conditions of employment that are mandatory subjects of collective bargaining, and (3) the agreement is produced from bona fide arms-length collective bargaining. Phoenix Elec. Co. v. National Elec. Contractors Ass'n., 81

F.3d 858, 861 (9th Cir. 1996); Mackey v. National Football League, 543 F.2d 606, 614 (8th Cir. 1976).

As explained above, the apparent basis of the antitrust claims against the International is that it afforded Harris Davis a benefit which is not available to plaintiff. Favoring one set of union contractors over another is protected by the nonstatutory exemption. In Grinnell Corp. v. Road Sprinkler Fitters Local Union No. 669, a union contractor sued the union representing its employees for antitrust violations involving a "job targeting" program. 1997 WL 311498 at *6 (D. Md. 1997). Under the job targeting program, the union would allow a concessionary wage rate to an employer for a single job. Id. at *2. The plaintiff alleged that the union had conspired with an association of other union contractors (of which the plaintiff was formerly a member) to deny it access to job targeting wage concessions. Id. While the Court found no evidence of such a conspiracy, it held that even if a conspiracy existed it would fall under the nonstatutory exemption:

> Insofar as the alleged conspiracy to withdraw targeting is concerned, the requirements for the application of the nonstatutory labor exemption have been met in this case. The challenged conduct in question occurred at a time when the Union was preparing to engage in the collective bargaining process. If the Court were to assume, arguendo, that the Union and the NFSA agreed to withdraw the job targeting program from contractors who would not be signatories to the new 1994–1997 collective bargaining agreement, such an undertaking on their part would have primarily affected the parties themselves, would have concerned wages, hours and conditions of employment and would have been produced during bona fide arms-length collective bargaining between the parties.

Id. at *12 (internal citations omitted).

Similarly, in Continental Maritime of San Francisco, Inc. v. Pacific Coast Metal Trades Dist. Council, Metal Trades Dept., AFL-CIO, a union ship repair firm filed an antitrust suit, claiming that the union representing its employees had conspired with other union firms to exclude it from a wage concession granted to the other union firms. 817 F.2d 1391 (9th Cir.

11

1987). The Ninth Circuit rejected this claim, reasoning that the agreement fell under the nonstatutory exemption:

> These examples, and the record read as a whole in the light most favorable to [plaintiff], indicate no more than that the goal of the parties was to bring more government ship repair work to Northwest Marine and Dillingham. While the parties may have hoped that all of this work would come at the expense of non-union firms, they must have expected that some of it could come from other union firms like [plaintiff]. There is no evidence, however, that the defendants were motivated by anything but the goal of helping the Portland firms. There is no evidence that they agreed to deny wage concessions to [plaintiff].

Id. at 1395.

Here, the International's agreement with Harris Davis is a bona fide collective bargaining agreement primarily affecting the signatory parties which establishes wages and conditions of employment for Harris Davis' employees. Therefore, the nonstatutory exemption applies, despite any allegation that the Rebar Agreement gives an advantage to Harris Davis over plaintiff.

### 4. Count VI (Valentine Act) is Preempted by Federal Labor Law

The U.S. Supreme Court has long held that federal labor law preempts Ohio's Valentine Act when it is applied to a labor organization's agreement regarding a mandatory subject of bargaining. Local 24, Int'l Bhd. of Teamsters v. Oliver, 358 U.S. 283, 295 (1959). Similarly, in Connell Const. Co., Inc. v. Plumbers & Steamfitters Local Union No. 100, the Supreme Court held that a state antitrust claim may not be maintained when it creates "a substantial risk of conflict with policies central to federal labor law." 421 U.S. 616, 637 (1975). More generally, a state's antitrust act does not apply when the claim relates to activity either arguably protected or prohibited by Sections 7 or 8 of the National Labor Relations Act, 29 U.S.C. §§ 157-158. See Weber v. Anheuser-Bush Inc., 348 U.S.468, 481 (1955) ("…Congress has sufficiently expressed its purpose to bring it within federal oversight and to exclude state prohibition, even though that

12

with which the federal law is concerned as a matter of labor relations be related by the State to the more inclusive area of restraint of trade.").

Count IV implicates the International's collective bargaining relationship with Harris Davis. Collective bargaining is protected by Section 7 of the NLRA. See, e.g., Wash. Sprinkler, Inc., 344 NLRB 396, 397 (2005) (noting that construction industry pension funds are mandatory subjects of bargaining). Because the alleged restraint at issue here is a collectively-bargained provision related to the mandatory bargaining subject of retirement benefits, the Valentine Act is preempted.

### III.    Conclusion

Count I must be dismissed because the Rebar Agreement is specifically exempted from the Favored Nations Provision in the Local 17 collective bargaining agreement. Counts IV and VI must be dismissed because the Rebar Agreement requires that Harris Davis pay same wage and fringe package as plaintiff, plaintiff has failed to plead specific intent by the International, and the International's conduct is protected by the nonstatutory labor exemption from antitrust law. Finally, Count VI is preempted by federal labor law.

Respectfully submitted,

HARTNETT GLADNEY HETTERMAN, L.L.C.

/s/ Michael A. Evans
JEFFREY E. HARTNETT, (No. 27481MO)
MICHAEL A. EVANS, (58583MO)
4399 Laclede Avenue
St. Louis, Missouri 63108
Telephone: 314-531-1054
Facsimile:  314-531-1131
jhartnett@hghllc.net
mevans@hghllc.net

Attorneys for Defendant International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, AFL-CIO

and


MACALA & PIATT, LLC

/s/ Ronald G. Macala  (with consent)
RONALD G. MACALA (0014396)
p
601 South Main Street
North Canton, Ohio 44720
Telephone: 330-493-1570
Facsimile:  330-493-7042
rmacala@mgplaborlaw.com
tpiatt@mgplalaborlaw.com

Attorneys for Defendant International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, AFL-CIO

**CERTIFICATE OF SERVICE**

I hereby certify that on March 17, 2014, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all parties having appeared in this action. I further certify that I mailed the foregoing document and the notice of electronic filing by first class mail to the non-CM/ECF participants.

/s/ Michael A. Evans

14