IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

------------------------------------------------------ :
MOHAWK REBAR SERVICE, INC., : CASE NO. 1:14 CV 00137
 :
 :
Plaintiff, : MEMORANDUM OF OPINION AND
 : ORDER
-vs- :
 :
 :
INTERNATIONAL ASSOCIATION OF :
BRIDGE, STRUCTURAL, :
ORNAMENTAL, AND REINFORCING
IRON WORKERS LOCAL UNION NO.
17, *et al.*,

Defendants.
------------------------------------------------------

UNITED STATES DISTRICT JUDGE LESLEY WELLS

The plaintiff Mohawk Rebar Service, Inc., ("Mohawk") brings this antitrust and breach of contract action against defendants International Association of Bridge, Structural, Ornamental, and Reinforcing Iron Workers Local Union 17 ("Local 17"), the International Association of Bridge, Structural, Ornamental, and Reinforcing Iron Workers ("the International Association"), and Harris Davis Rebar, LLC ("Harris Davis"). Presently before the Court are the defendants' respective motions to dismiss the plaintiff's first amended complaint. (Doc. 33, 34, 35). The plaintiff Mohawk has filed an omnibus brief in opposition (Doc. 37), and the defendants have filed reply briefs,

respectively. For the reasons that follow, the defendants' motions to dismiss will be granted, and this matter will be dismissed in its entirety.

## I. Background

The plaintiff Mohawk is an Ohio Corporation engaged in the business of reinforcing steel ("rebar") for concrete applications on construction projects throughout Northeast Ohio. (First Amended Complaint, Doc. 31 (hereinafter "Complaint") ¶4). Defendant Harris Davis is also in the rebar business, and it is authorized to do business in Ohio. (Complaint ¶8). Defendant Local 17 is a labor union which provides iron workers to Mohawk, Harris Davis, and other employers in the industry for construction projects in Northeast Ohio. (Complaint ¶5). Defendant the International Association is a labor organization consisting of various regional and local unions throughout the United States, one of which is Local 17. (Complaint ¶6).

Since 1981, plaintiff Mohawk and defendant Local 17 have been parties to a collective bargaining agreement ("the CBA"). (Complaint ¶11). Pursuant to the CBA, Mohawk is obligated to pay its employees union scale wages and benefits, and it is obligated to contribute $10 per employee-hour worked to a multiemployer defined benefit pension plan ("the Pension Fund" or "the Fund"). (Complaint ¶13). Because operation of the Fund is governed by ERISA, a participating employer who ceases to have an obligation to contribute to the Fund is generally required to pay a proportionate share of the Fund's underfunding. (Complaint ¶13).This is called withdrawal liability. See 29 U.S.C. § 1301, et seq. Mohawk asserts that the current amount of its withdrawal liability is approximately $6 million. (Complaint ¶13). As the defendants point out, however, and the plaintiff concedes, this figure represents not what Mohawk owes

presently, but what it would allegedly owe *if* withdrawal liability were triggered. Withdrawal liability is triggered only when certain conditions are met. For instance, an employer in the construction industry that continues to perform similar work in the same local jurisdiction on a non-contributory basis would trigger withdrawal liability. See 29 U.S.C. § 1383(b). It is undisputed that, to date, none of the necessary conditions of withdrawal liability have been met here, as Mohawk asserts that it has fulfilled all its obligations to contribute to the Pension Fund. (Complaint ¶14).

In addition, the CBA contains a "Favored Nations Clause," which provides:

> If the union shall furnish Iron Workers to any Employer within the area of jurisdiction of this Agreement upon any more favorable conditions than those contained therein, the Union agrees that such more favorable wage rates and conditions other than those contained in a Market Retention Agreement shall automatically be extended to the Employer[.] Special Local Area or National Agreements negotiated to cover specific projects or classes of work shall be excluded from this provision.

(Complaint ¶19). In broad strokes, the Favored Nations Clause stands for the proposition that if Local 17 gives a better deal to another employer doing the same sort of work, in the same area, it must extend the same deal to Mohawk.

Mohawk maintains that defendant Harris Davis was given a better deal when Harris Davis entered into the National Reinforcing Steel Agreement ("Rebar Agreement") with the International Association. The Rebar Agreement is similar to the CBA in that Harris Davis, like Mohawk, is obligated to contribute $10 per employee-hour worked into a pension fund; and, also like Mohawk, Harris Davis must pay union scale wages and benefits to its union employees. (See Doc. 31-3). The only relevant difference here--and the allegedly more favorable wage rate or condition--is that Harris Davis, while obligated to contribute to a retirement fund, is not obligated to contribute to

3

the Pension Fund. (Complaint, ¶24). Instead, Harris Davis may contribute to a retirement plan other than the Pension Fund, provided the alternate plan is not subject to the withdrawal liability provisions of Title IV of ERISA but otherwise complies with ERISA. (Complaint, ¶24). Mohawk contends that because Harris Davis does not face a threat of withdrawal liability, it has been given a more favorable wage or condition. (Complaint, ¶36).

Further, because Harris Davis faces no withdrawal liability under the Rebar Agreement, it is Mohawk's position that Harris Davis has been given an unfair competitive advantage. (Complaint, ¶33, *passim*). And as a result, Mohawk maintains, Harris Davis was able to underbid Mohawk in a job for the construction of a parking structure in Cleveland, Ohio. (Complaint, ¶31). After Harris Davis won the subcontract, Local 17 provided ironworkers to Harris Davis pursuant to the terms of the Rebar Agreement. (Complaint, ¶35). Although Local 17 is not a party to the Rebar Agreement, it was bound to honor it, Mohawk alleges, by virtue of the Constitution of the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers ("Association Constitution"), which enforces terms and conditions upon regional and local unions. Thus, by abiding by the terms of the Rebar Agreement, Mohawk argues, Local 17 extended a more favorable wage rate or condition to Harris Davis, i.e. that Harris Davis does not face any potential withdrawal liability when it contributes to the alternate fund. (Complaint, ¶20).

Mohawk points out that in order for Local 17 to technically comply with the Favored Nations Clause it must extend the same condition to Mohawk that it extended to Harris Davis. (Complaint, ¶41). One problem with this, as Mohawk explains it, is that

4

if Local 17 did so and allowed Mohawk to contribute to the alternate fund, Mohawk could not cease contributing to the Pension Fund without triggering withdrawal liability with respect to the Pension Fund. (Complaint, ¶39). If such liability were triggered, Mohawk asserts, it would be devastating to Mohawk's business. (Complaint, ¶41). Mohawk argues, in sum, that these circumstances amount to a violation of the Favored Nations Clause, for which both Local 17 and the International Association are liable. (Complaint, ¶45). Mohawk maintains that Local 17 breached the Favored Nations Clause and that the International Association has unlawfully interfered with the protections afforded to Mohawk under it.

Anticipating that Local 17 and the International Association will argue that Mohawk failed to exhaust contractual grievance procedures, Mohawk has acknowledged that the CBA contains a grievance procedure for the resolution of disputes or disagreements arising from the CBA. (Complaint, ¶46). Mohawk further acknowledges that it and the International Association are parties to the Iron Workers International Agreement dated November 19, 2004 ("International Agreement"), which refers any dispute to the grievance procedure set forth in the CBA. (Complaint, ¶47). Mohawk indicates that it has not utilized the contractual grievance procedure, but it asserts that should be excused from using it, because its use would be ineffective and otherwise futile. (Complaint, ¶48).

Mohawk further maintains that the provisions of the Rebar Agreement that allow Harris Davis to avoid any potential withdrawal liability amount to violations of the antitrust laws. Mohawk argues that by participating in the Rebar Agreement, Harris Davis engaged in anticompetitive and predatory conduct. Mohawk asserts that because

5

Harris Davis is not obligated to contribute to the Pension Fund, it has an unfair competitive advantage and it will be able to obtain a disproportionate amount of the rebar work in Local 17's jurisdiction. Mohawk maintains that as a result, the defendants will be able to reduce and eventually eliminate competition in Local 17's jurisdiction.

On January 21, 2014, Mohawk filed the instant action. After the defendants filed respective motions to dismiss the complaint, Mohawk filed an amended complaint, in which Mohawk asserts the following claims:

(1) Violation of the Favored Nations Clause (against Local 17 and the International Association);

(2) Monopolization in violation of 15 U.S.C. § 2 (against Harris Davis);

(3) Attempted monopolization in violation of 15 U.S.C. § 2 (against Harris Davis);

(4) Conspiracy to monopolize in violation of 15 U.S.C. § 2 (against Harris Davis, Local 17, and the International Association);

(5) Violation of the Valentine Act, Ohio Revised Code § 1331.02 (against Harris Davis);

(6) Conspiracy to violate the Valentine Act, Ohio Revised Code § 1331.04 (against Harris Davis, Local 17, and the International Association)

In its prayer for relief, Mohawk seeks declarations that Local 17 has violated the Favored Nations Clause and that the International Association compelled Local 17 to do so. (Complaint, p. 21). Mohawk maintains that Local 17 and the International Association should be enjoined from engaging in this allegedly unlawful activity. (Complaint, p. 22). Mohawk further seeks damages, fees and costs from all three defendants. (Complaint, p. 22). The defendants now respectively move to dismiss the first amended complaint.

6

## II. Standard

The plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A 12(b)(6) motion tests the sufficiency of the complaint. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

## III. Law and Argument

### A. Violation of the Favored Nations Clause

Mohawk claims that Local 17 violated the Favored Nations Clause contained in the CBA when it honored the Rebar Agreement, which relieved Harris Davis of the obligation of contributing to the Local 17 Pension Fund and allows it to avoid any potential withdrawal liability. Mohawk further asserts that by force of the Association Constitution, the International Association compelled Local 17 to breach the Favored Nations Clause.

*Exhaustion*

Local 17 argues that Mohawk's breach of the Favored Nations Clause claim, as to Local 17, should be dismissed because Mohawk has failed to exhaust the contractual grievance procedures contained in the parties' agreement. Section 301 of the Labor Management Relations Act ("LMRA") grants federal courts jurisdiction over

suits for violation of contracts between an employer and a labor organization. 29 U.S.C. § 185(a). A prerequisite for suit under Section 301 is that parties exhaust grievance and arbitration procedures established by the applicable collective bargaining agreement. See Apponi v. Sunshine Biscuits, Inc., 809 F.2d 1210, 1216 (6th Cir. 1987). "Whether a dispute must be arbitrated before judicial relief may be sought is determined by analyzing the collective bargaining agreement to see if it permits or requires arbitration." Id.

Under Section 301, courts will generally enforce provisions of a labor agreement that provide procedures for the settlement of disputes through mutual discussion and arbitration. Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 562 (1976)."[F]inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes . . . ." Id. (quoting 29 U.S.C. §173(d)). "Courts are not to usurp those functions which collective-bargaining contracts have properly 'entrusted to the arbitration tribunal.'" Id. (quoting Steelworkers v. American Mfg. Co., 363 U.S. 564, 566 (1960). Permitting parties "to sidestep available grievance procedures would cause arbitration to lose most of its effectiveness, . . . as well as eviscerate a central tenet of federal labor-contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance." Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220 (1985) (citing Republic Steel Corp. v. Maddox, 379 U.S. 650, 653 (1965).

In the present case, Mohawk's first amended complaint acknowledges that the CBA contains a grievance procedure for resolving all disputes arising under the agreement. Mohawk further acknowledges that it has not utilized the agreed upon

8

procedure, but it claims that it would be futile or ineffective for it to do so. Mohawk accordingly claims it should be excused from exhausting these procedures.

In particular, Mohawk argues that the instant dispute involves parties, agreements, and issues that are not governed by the CBA. Mohawk asserts that its claim of breach of the Favored Nations Clause against Local 17 inextricably involves the actions of the International Association, in that the International Association allegedly compelled Local 17 to breach the Favored Nations Clause. Because the International Association is not subject to the grievance procedures set forth in the CBA, Mohawk contends, the arbitrator would be without authority to provide any relief with respect to its actions. In sum, Mohawk asserts that the International Association is a necessary and critical party to the dispute involving the Favored Nations Clause. Thus, Mohawk argues, reliance on the contractual grievance procedure would be futile because an arbitrator would be unable to provide complete relief to Mohawk.

In the Court's view, Mohawk has not met its burden to show that use of the contractual grievance procedure would be futile. In order to excuse a failure to exhaust, the plaintiff must make a "clear and positive showing of futility." Allied Mech. Servs., Inc. v. Local 337 of United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus., 221 F.3d 1333 (6th Cir. 2000). A bare allegation of futility is not sufficient. Yenyo v. Fairmount Foods Co., 1981 U.S. App. LEXIS 11863 (6th Cir. 1981). Nor is a plaintiff's subjective belief of futility enough. Terwilliger v. Greyhound Lines, Inc., 882 F.2d 1033, 1039 (6th Cir. 1989). The test "is not whether [the plaintiff's] grievances would succeed, but whether [the plaintiff] could have availed itself of the grievance procedure." Allied

9

Mech., 221 F.3d 1333 (citing Mason v. Continental Group, Inc., 763 F .2d 1219, 1224 (11th Cir.1985)).

In Glover v. St. Louis-San Francisco R. Co., 393 U.S. 324, 329-30 (1969), African-American employees alleged that the union conspired with the employer to bar their promotion because of their race. Id. at 325. The futility exception applied in that case because the plaintiffs had repeatedly complained about the discrimination, and the Court indicated that the plaintiffs should not be required to "submit their controversy to a 'group which is in large part chosen by the (defendants) against whom their real complaint is made.'" Id. (citing Steele v. Louisville & N.R. Co., 323 U.S. 192, 206 (1944).

The gist of Mohawk's first claim is that Local 17 violated the Favored Nations Clause contained in the CBA when it provided iron workers to Harris Davis pursuant to the terms of the Rebar Agreement. There is little question this is a dispute that arises out of the CBA. Therefore, because Mohawk previously agreed that it would resolve all disputes arising out of the CBA pursuant to the grievance procedures contained therein, Mohawk's claim as to Local 17 should be heard pursuant to those procedures. The fact that an arbitrator may not have the authority to hear Mohawk's claims against the International Association does not make its claims against Local 17 futile, and Mohawk cites no authority to support the idea that the International Association's involvement in this dispute excuses Mohawk from participating in contractual grievance procedures on the ground of futility. In addition, because, as explained below, all of Mohawk's antitrust claims are subject to dismissal, there is even less force to Mohawk's contention that this case involves parties and issues over which the arbitrator would not have authority.

10

While Mohawk complains that an arbitrator would not be able to grant the relief it seeks, the question is not whether Mohawk would succeed, but rather whether contractual procedures would be available to it. Unlike the plaintiffs in Glover, there is no allegation that Mohawk was somehow frustrated in its attempts to present its grievance against Local 17. Nor is there any allegation that the contractual grievance procedure would somehow be unfair, as was the case in Glover. As noted in Glover, "it is settled that the employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement." Id. (quoting Republic Steel Corp. v. Maddox, 379 U.S. 650 (1965). While Mohawk claims this is outdated language, this principle has been reiterated in subsequent cases. In Terwilliger, the Sixth Circuit held that "[b]efore a section 301 action can be initiated, an employee must attempt to use the procedures available under the collective bargaining agreement." Terwilliger, 882 F.2d at 1040. There is no allegation that Mohawk ever attempted to resolve this dispute through contractual grievance procedures, and Mohawk has not made a clear and positive showing of futility.

*Failure to state a claim as to Mohawk and the International Association*

In any event, assuming for the sake of argument that this Court has jurisdiction to hear this matter, Mohawk's claim that the Favored Nations Clause has been breached is not a claim upon which relief can be granted. Under the Favored Nations Clause, if Local 17 provides iron workers to another employer upon "more favorable wage rates and conditions," then that same more favorable wage rates and conditions are to be automatically extended to Mohawk. Assuming for the sake of argument that Harris Davis has been given "more favorable wage rates and conditions," Mohawk does

11

not complain that Local 17 failed to live up to its obligation and automatically extend those same rates and conditions to Mohawk. Instead, Mohawk contends that even if those more favorable wage rates and conditions were extended to it, Mohawk would not accept them because, when applied to Mohawk, the wage rates and conditions are *not* more favorable as to it. Mohawk in fact alleges that extending the same wage rates and conditions, in compliance with the contract, would be damaging to it because it would trigger withdrawal liability. Given this particular set of allegations, the Court agrees with Local 17 that Mohawk has not stated a plausible breach of contract claim. And, for this reason, Mohawk's claim that the International Association compelled Local 17 to breach the contract is also implausible.

### B. Antitrust standing and injury

As for Mohawk's antitrust claims, the defendants maintain that Mohawk fails to allege sufficient facts to establish antitrust standing. The Court agrees. "[S]tanding in an antitrust case is more onerous than the conventional Article III inquiry." Static Control Components, Inc. v. Lexmark Int'l, Inc., 697 F.3d 387, 402 (6th Cir. 2012). "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [it] must [be] dismiss[ed] ... as a matter of law—lest the antitrust laws become a treble-damages sword rather than the shield against competition-destroying conduct that Congress meant them to be." NicSand, Inc. v. 3M Co., 507 F.3d 442, 450 (6th Cir. 2007) (en banc). As a result of this high pleading hurdle, "the federal courts have been 'reasonably aggressive' in weeding out meritless antitrust claims at the pleading stage[.]" Id. (quoting Valley Prods. Co. v. Landmark, 128 F.3d 398, 403 (6th Cir. 1997)).

A district court decides whether a plaintiff has adequately pleaded antitrust standing by balancing five factors:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

Southaven Land Co., Inc. v. Malone & Hyde, Inc., 715 F.2d 1079, 1085 (6th Cir. 1983) (citation omitted). The Court addresses the applicable factors below.

In this instance, the connection between the alleged antitrust violation and Mohawk's injury is tenuous, and the Court is unable to reasonably infer that harm was intended to be caused. Mohawk alleges, and it is undisputed, that under the Rebar Agreement, Harris Davis is not obligated to contribute to the Pension Fund. Instead, the agreement allows Harris Davis to contribute to a retirement fund that is not subject to the withdrawal liability provisions of ERISA. Thus, Harris Davis will incur no withdrawal liability as a result of this agreement. Mohawk's position is that because Harris Davis carries no potential withdrawal liability, Harris Davis is at an unfair competitive advantage. Mohawk alleges that as a result of this advantage, Harris Davis was able, and will continue to be able, to underbid Mohawk for construction jobs in the area. In addition to claiming the Rebar Agreement provides Harris Davis with an unfair competitive advantage, Mohawk contends that this advantage will allow Harris Davis to eventually obtain monopoly power.

One critical problem with Mohawk's claim is that it pleads no facts to support the idea that because Mohawk pays into the Pension Fund and Harris Davis does not,

Mohawk has been caused to face a greater financial hardship at the present time. It is undisputed that Harris Davis does not carry the threat of withdrawal liability, but Mohawk fails to explain what it is about the absence of withdrawal liability that allows Harris Davis to bid lower than it would be able to if it did carry withdrawal liability. Mohawk concedes that withdrawal liability is not "booked" until an actual withdrawal happens, and, in this instance, Mohawk's liability has not been booked, since it has not withdrawn from the Fund. Further, Mohawk alleges that, to date, it has complied with its obligations to contribute to the Pension Fund, and it alleges no intention to withdraw from the Fund. Mohawk claims, in a conclusory way, that the Rebar Agreement affords Harris Davis a financial advantage in the present, but the plaintiff does not say exactly what that advantage is.

Mohawk claims that Harris Davis has been able to reduce its costs as a result of the Rebar Agreement, but when challenged as to what those costs are, it is unable to describe them with any degree of specificity. Further, Mohawk is unable to describe how its own costs are greater. Based on the Court's review, it is evident that Harris Davis's present burden is precisely the same as that of Mohawk. Like Mohawk, Harris Davis pays $10.00 per employee-hour worked into a retirement fund, and like Mohawk, Harris Davis must pay local union scale for wages and benefits. Thus, even with the factual allegations viewed in favor of the plaintiff, the Court is unable to infer a causal connection between the alleged antitrust violation and Mohawk's alleged injury.

While it is undisputed that Mohawk is a competitor of Harris Davis, Mohawk's alleged injury, as already suggested, is of a contingent, speculative, and unrealized nature. First, there is no dispute that because Mohawk operates in the construction

14

industry, a complete withdrawal will only occur if Mohawk ceases to have an obligation to contribute to the fund but continues to perform work or, within five years, resumes performing work in the jurisdiction of the CBA of the type for which contributions were previously required. See 29 U.S.C. 1383(b)(2). Thus, a mere cessation of the obligation to contribute, such as when a company is sold or goes out of business, is not sufficient to trigger liability. Based on the allegations in the complaint, whether and at what time Mohawk will be subject to withdrawal liability is highly speculative. Furthermore, even if Mohawk ultimately becomes liable, the amount of that liability is far from certain. As noted by Harris Davis, and undisputed by the plaintiff, "an employer's share of unfunded vested liability is generally derived from a formula which takes into account the contribution history of an employer and comparatively apportions that history to the contribution histories of other contributing employers." (Doc. 35-1 at 14 (citing 29 U.S.C. 1391(a)). Thus, the existence and extent of Mohawk's withdrawal liability obligation is necessarily governed by future events.

Mohawk's allegation that it suffers injury because the funding status of the Pension Fund worsens as a consequence of the Rebar Agreement is untenable, and the first amended complaint contains no factual allegations that would support this idea. As Harris Davis points out, it is undisputed that Harris Davis is not a contributing employer to the Pension Fund and that its employees do not accrue benefits in the Fund. Because Harris Davis does not participate in the Fund, the amount of benefits that will ultimately vest will not increase. Mohawk cannot credibly claim that Mohawk's liability in the Fund somehow increases as a result of Harris Davis's non-participation in it.

In its brief in opposition, Mohawk asserts a number of other potential injuries, including the threats of an excise tax, additional assessments, and "partial withdrawal" or "mass withdrawal." The primary trouble with these claims is that Mohawk makes no such allegations in the first amended complaint, and it is black letter law that a plaintiff may not cure a pleading deficiency through assertions in a brief in opposition to a motion to dismiss.

Furthermore, Mohawk fails to allege actual anticompetitive behavior or an antitrust injury. Mohawk focuses on possible harm to itself (citing, as noted above, the possible imposition of withdrawal liability, excise taxes, and assessments), but it does not allege how the defendants' actions "harmed *competition* in the relevant market, as the Sherman Act requires." Elias v. Fed. Home Loan Mortg. Corp., 581 Fed.Appx. 461, 468, 2014 WL 3702597, at *7 (6th Cir.2014) (emphasis in original) (dismissal based on lack of antitrust standing). "To prove antitrust injury, the key inquiry is whether competition—not necessarily a competitor—suffered as a result of the challenged business practice." CBC Companies, Inc. v. Equifax, Inc., 561 F.3d 569, 571–72 (6th Cir.2009) (citing NicSand, 507 F.3d at 450 ("[O]ne competitor may not use the antitrust laws to sue a rival merely for vigorous or intensified competition.")). The fact that Mohawk was underbid for a single job does not demonstrate that competition was harmed in the relevant market.

In the Court's view, the first amended complaint fails to establish that Mohawk has antitrust standing. The connection between the alleged wrongdoing and the alleged injury is tenuous; Mohawk's alleged injury is indirect and not the type the antitrust laws were intended to prevent; and damages are speculative.

16

## C. Non-statutory exemption

The defendants further maintain that Mohawk's claims are barred by the non-statutory labor exemption. The Court agrees. The non-statutory labor exemption applies if the agreement at issue: (1) "primarily affects only the parties to the collective bargaining relationship"; (2) "concerns a mandatory subject of bargaining"; and (3) "is a product of bona fide arm's-length bargaining." Mackey v. NFL, 543 F.2d 606, 614-15 (8th Cir. 1976).

In this instance, there is no dispute that retirement pay is a mandatory subject of bargaining, and Mohawk does not allege that the Rebar Agreement was not a product of a bona fide arm's-length negotiation. The only question under Mackey therefore is whether the Rebar Agreement "primarily affects only the parties to the collective bargaining relationship." An agreement primarily affects only the parties thereto if the primary impact is on the agreeing employer and its employees. See Zimmerman v. Nat'l Football League, 632 F.Supp 398, 405 (D.D.C. 1986). In Zimmerman, the court observed that the purpose of the first element of the Mackey test is to "withhold the exemption from agreements that primarily affect competitors of the employer, or . . . economic actors completely removed from the bargaining relationship." Id.

The Court agrees with the defendants that the Rebar Agreement primarily affects the parties to that agreement. The restraint at issue here--that Harris Davis is not obligated to contribute into the Pension Fund--affects primarily Harris Davis and its employees by altering the form of retirement benefits. There is no direct effect on Mohawk, and the fact that the agreement may have had a secondary effect on Mohawk, in that Harris Davis has reduced its costs (though Mohawk provides no factual

17

allegations to support this claim) such that it can underbid Mohawk, is not sufficient. Instructive on this point is a case cited by the defendants, Local Union 257, Int'l Bhd. of Elec. Workers, AFL-CIO v. Sebastian Elec., 121 F.3d 1180, 1182 (8th Cir. 1997). In Sebastian Electric, defendant electric companies alleged a counterclaim that the local union for electrical workers had violated the antitrust provisions of the Sherman Act when the union participated in a so-called "Target Fund." The fund, which was financed by the local union, provided partial payment of wages paid to members of Local 257 when the employer was party to a collective bargaining agreement with Local 257. Participating employers were able to submit lower bids than they could have otherwise without the fund's assistance. The defendant electrical companies argued that operation of the Target Fund resulted in a form of price-fixing designed to force out competition.

On a motion for summary judgment, a panel of the Eighth Circuit concluded that the nonstatutory exemption barred the defendants' counterclaim. Even though participation in the Target Fund indirectly affected non-participating employers, in that participants were able to submit bids lower than non-participating competitors, the court concluded that the reimbursement arrangement primarily affected only the parties to the agreement. Thus, a collective bargaining agreement that merely reduces the costs of an employer and causes other companies to lose bids does not create liability under the antitrust laws. Mohawk fails to provide any counterpoint to this idea. In any event, as already discussed, Mohawk does not describe a situation where Harris Davis's costs have been reduced such that Mohawk has been placed at a competitive disadvantage. Mohawk's present financial obligations under the CBA are the same as those of Harris

18

Davis, and Mohawk fails to provide any facts to support the idea that by avoiding any future withdrawal liability, Harris Davis has a distinct advantage in the present.

The case law cited by Mohawk is unpersuasive in this instance. For example, Mohawk cites <u>Allen Bradley Co. v. Local Union No.3, IBEW</u>, 325 U.S. 797 (1945) for the proposition that it was not the "purpose of Congress to immunize labor unions who aid and abet [employers] in violating the Sherman Act." In <u>Allen Bradley</u>, as part of an effort to expand its membership, the defendant union sought to obtain "closed shop" agreements with all local electrical equipment contractors. Under the agreements, the contractors and manufacturers were obligated to purchase and sell equipment from only other signatories to the closed shop agreements. This arrangement led to a complete monopoly, where the products of non-participating firms were pushed out of the market. The question for the Supreme Court was whether these activities, which "quite obviously" violated the Sherman Act, were immunized by the union's participation. The Court held that a labor union is not immune where it aids and abets employers in violating the Sherman Act.

<u>Allen Bradley</u> is inapposite. In that case, there was no question that business entities involved had violated the Sherman Act. The question presented, whether the violations were immunized by the union's involvement, is not at issue in this instance. In sum, the Court concludes that the non-statutory exemption bars the plaintiff's antitrust claims.

### E. Valentine Act claims

The defendants contend that Mohawk's claims under Ohio's Valentine Act should be dismissed because those claims mirror the plaintiff's meritless federal

19

antitrust claims. The Court agrees. The Ohio Supreme Court has held that the Valentine Act must be construed in harmony with federal antitrust law. See Johnson v. Microsoft Corp., 834 N.E.2d 791, 800-02 (Ohio 2005). Therefore, for all the reasons stated above, the plaintiff's causes of action under the Valentine Act, R.C. 1331.02 & 1331.04, will be dismissed.

### IV. Conclusion

For the reasons stated above, the defendants' respective motions to dismiss are granted. This matter is dismissed in its entirety.

IT IS SO ORDERED.

      /s/ Lesley Wells
   UNITED STATES DISTRICT JUDGE

Date: 24 September 2015